THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* OLIVER M. OLSON, Respondent.

*Opinion filed June 16, 1926—Rehearing denied October 6, 1926.*

1. DISBARMENT—*charges of criminal misconduct need not be
proved beyond reasonable doubt.* The fact that an information for
disbarment of an attorney charges criminal misconduct does not
require that the evidence establish the respondent's guilt of crime
beyond a reasonable doubt, as it is not necessary that an informa-
tion, to constitute a sufficient basis for the disbarment of an at-
torney, shall charge him with the commission of a crime, and
where the evidence shows unprofessional and dishonorable conduct
warranting disbarment of the attorney it is not material that he
might have successfully defended a prosecution for crime.

2. SAME—*attorney may be disbarred for betraying clients' in-
terests.* An attorney who abuses the confidence of clients and be-
trays their interests no longer possesses the character necessary to
entitle him to be held out to the world as a lawyer to whom clients
may with confidence entrust their business and affairs.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

NINIAN H. WELCH, (OLIVER M. OLSON, *pro se,*) for
respondent.

Mr. JUSTICE DUNN delivered the opinion of the court:

An information filed for the disbarment of Oliver M.
Olson having been answered, was referred to Roswell B.
Mason, a master in chancery of the circuit court of Cook
county, as commissioner, to hear the evidence and report his
conclusions. The commissioner made his report of the evi-
dence together with his findings, to which the respondent
filed objections. These were overruled by the commissioner.
The report was filed with the commissioner's recommenda-

tion that the respondent's name be stricken from the roll of attorneys, and the cause has been submitted upon the report and exceptions by the respondent.

The respondent was licensed on October 3, 1906, as an attorney at law, and after that date practiced law continuously in the city of Chicago until September 3, 1924, though his home was in Wheaton, where he also maintained an office. The information concerns his relations with two of his clients, each count referring separately to the affairs of one client. No question arises on the pleadings and it is unnecessary to state their allegations, since such a statement, followed by a discussion of the evidence, would involve much repetition.

The first count concerns Miss Emma K. McWhorter, a washer-woman, forty-eight years of age, who employed the respondent on December 19, 1923, to represent her in two suits pending in the circuit court of McHenry county, one against John McWhorter and the other against his daughter-in-law. Miss McWhorter had lived in the family of Mc-Whorter from 1887 until she was seventeen years old, as a daughter, though she was not legally adopted. She then went to Chicago, but in April, 1918, she returned and kept house for McWhorter until November 30, 1921. The suit against him was for services as a housekeeper during this period. The suit against his daughter-in-law was for assault and battery. The attorney's fees were contingent and were to be one-half the amount recovered. The cases were tried on December 24, 1923. The trials resulted in a verdict against the father for $855.40 and against the daughter-in-law for $50. Miss McWhorter advanced to the respondent on his fees $100 on December 20, $25 on December 26 and $100 on December 27. She testified that about January 10, 1924, the respondent asked her if she knew of anyone who had $800 to lend him. She told him that she did not, and he asked if she would lend him any money. She agreed to lend him $300, and did so, drawing out of her

savings account $280 and adding to that $20 which she had in her pocket-book. After this was done she had less than $100 left. The respondent executed his note to her, due in three months, for $300, with seven per cent interest, and on April 14 he paid the interest on this note ($5.25) and renewed it for ninety days. Motions for new trials were made in the two cases, and the respondent testified that he received notice from the trial judge that a new trial would be granted in the suit against McWhorter. He received an offer of $500 in satisfaction of both suits, which he communicated to Miss McWhorter. She accepted the offer, and the respondent received $500 in May, 1924, in settlement of the judgments. Upon his return to Chicago Miss McWhorter called at his office to get her money, and she testified that he told her he had used the money. She went out without saying anything. The respondent testified that he notified her that he had $250 of her money and offered to pay it to her; that he had the $250 in his pocket when she came in, and he told her it was her money if she wanted it but asked her to lend it to him, and she did so upon his agreement to pay her, with interest, in such amounts and at such times as she should need or want the money; that he then gave her $30 of the $250 and retained the remainder as a loan to him. At that time he had been paid, according to his own testimony, all of his fees but $25, he had borrowed $300 of her, he had collected $500 as her attorney, and she had less than $100. He afterward made several small payments to her, amounting in all to $170, the last payment being one of $25 on September 3, 1924. She made many visits to his office in Chicago requesting payment, without success. Of the $1025 of Miss McWhorter's money which the respondent has received he has paid her only $170, and giving him credit for $250 attorney's fee he still has $605 of her money, the greater part of which is money which he collected as her attorney and has failed to pay to her on her demand.

Mrs. Morrison testified that she was separated from her husband. They had one child, four years old. He was living at Grand Haven, Michigan, and she wanted to proceed against him to compel him to contribute to the support of the child. She consulted the respondent, who advised a suit for divorce, and on May 15, 1924, she paid him $5 and later an additional $5. Her husband afterward came to her in Chicago and she asked him for money, but he did not give her any. She told the respondent of this, and he advised her that the refusal of the money asked amounted to a technical case of abandonment and he could go over to Michigan and get her husband, and the costs would be about $50. Mrs. Morrison paid him $50. The next morning her husband telephoned to her at her sister's. She went to the respondent's office and had the call transferred there. She talked with her husband, who said he would come to Chicago on the next morning train. The respondent caused a warrant to be issued for his arrest and met the train with an officer but her husband came in by boat, and upon his arrival at her home she sent a messenger to the railway station to tell the respondent that her husband was at the house. The respondent and the officer went to the house and served the warrant. At the hearing of the abandonment charge the respondent appeared for Mrs. Morrison, and her husband was represented by Charles E. Meisner, of Grand Haven, and John Gutknecht, of Chicago. A verbal agreement was made there and the abandonment proceeding was continued until July 18. The substance of the agreement was that Mrs. Morrison should file a suit for divorce and her husband should enter his appearance, that he should pay $100 attorney's fee, $25 court costs and $100 at the time of the decree, to apply on alimony which was to be allowed for the support of the child at the rate of $5 a week. Mrs. Morrison thought the weekly payments were to begin at the time of the agreement, while the respondent

thought they were to begin at the time of the decree. The difference is not important in this case. The husband was permitted to go back to Michigan on his own recognizance. A controversy arose between the respondent and Meisner as to the contract and there was some correspondence between them, which seems to have been concluded when Gutknecht wrote to the respondent, under date of July 15, that he had tried to reach him by telephone but had been unable to do so and that he had a check for him. The check was for $50 and was given to the respondent, but after the receipt of the check he did not file any bill for divorce or do anything further, and Mrs. Morrison, in consequence, received none of the payments which were to be made to her. The abandonment suit was dismissed for want of prosecution. Mrs. Morrison called the respondent's office by telephone, made appointments with him which he did not keep, wrote him letters asking him to take care of the case, called at his office and spent much time in waiting for him, but was unable to meet him or get any information from him. He abandoned her cause without notifying her of his inability to proceed with it or returning the money which he had received in consideration of his doing so, and she lost whatever benefit she might have had from the action which had been taken and the agreement which had been made.

The only excuse offered by the respondent is that he had been engaged in the prosecution of important suits in Wisconsin which required him to make a great many trips to that State and also to make advances of money to such an extent as to embarrass him financially; that he had undertaken these cases without any expectation of being required to make advances in money, in association with another lawyer who had already been engaged in them for some time and who had already made advances to the extent of his resources; that during all the time of his employment by Miss McWhorter and Mrs. Morrison he was

expecting a return from these suits but continually met with disappointment; that as a result he was unable to pay the premium upon his life insurance policy of $10,000 and lost the benefit of it. About September 3, 1924, he went to Wisconsin in connection with his cases for an absence of some length, and during his absence his office associate, Mr. Driggs, permitted the office to be closed, and it was locked against the respondent under such circumstances (which were not stated) that to seek to gain admittance would have entailed undesirable publicity. At the hearing before the committee on grievances of the bar association and before the commissioner he insisted that his intentions were good; that if given an opportunity he would re-pay Mrs. Morrison the $110 which he had received in connection with her business and to Miss McWhorter the whole amount that he had received, less his fee. He did pay Mrs. Morrison $65 before the conclusion of the commissioner's hearing, in two payments,—one of $30 and the other of $35,—and Mrs. Morrison declined to permit him to continue in her employment. Miss McWhorter stated to the committee that she did not want the respondent to be disbarred but she did need and want her money.

The respondent argues that the information charges him with a crime, basing this claim on the fact that the information, after setting forth the transactions between the respondent and Miss McWhorter and the respondent and Mrs. Morrison, charges that the acts and conduct of the respondent were unprofessional, dishonorable and criminal, and he insists that where a crime is charged in the pleadings it must be proved beyond a reasonable doubt. It is not necessary that an information, to constitute a sufficient basis for the disbarment of an attorney, should charge him with the commission of a crime or that the evidence should establish his guilt of a crime. The standard of conduct required of an attorney at law is not such as will merely enable him to avoid the penalties of the criminal law. His

license is not only a certificate that he has the ability to represent properly his clients, but that he has a good moral character which will justify the confidence of clients in relying upon his integrity and his fidelity to their interests. If he abuses that confidence and betrays those interests he no longer possesses the character necessary to entitle him to be held out to the world as a lawyer to whom clients may with confidence entrust their business and affairs. (*People* v. *Grusd,* 318 Ill. 44.) As a result of her misplaced confidence in the respondent not only has Miss McWhorter lost the benefit of the litigation which he won for her, but he has practically all of her savings, for which she holds his note which she cannot collect. This much is proved beyond a reasonable doubt, and whether the circumstances are such that the respondent can shield himself from a criminal prosecution or not, they afford no defense against the charge of unprofessional and dishonorable conduct.

The transactions with Mrs. Morrison do not show the same degree of turpitude as with Miss McWhorter, but they show neglect, a failure to attend to the business which he had undertaken and a disregard of his duty to his client. If he was prevented by conflict of duties from personally rendering her the service which he had contracted to render he should have informed her, arranged for some other disposition of the business and returned to her the money which she had paid him, for which he had not rendered the services agreed upon. His failure to do so is without excuse.

The rule is made absolute and the respondent's name stricken from the roll of attorneys.          *Rule made absolute.*